1

2

3

4

5

6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

7

8

9

10

11

12

TERRENCE R. VIERNES,

Plaintiff,

v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

Defendant.

Case No. 2:14-cv-01541-GMN-PAL

**REPORT OF FINDINGS AND
RECOMMENDATION**

(Mot. To Remand – ECF No. 12)
(Cross-Mot. to Affirm – ECF No. 16)

13

14

15

16

17

This matter involves Plaintiff Terrence R. Viernes' appeal and request for judicial review of the Acting Commissioner of Social Security, Defendant Carolyn W. Colvin's final decision denying his claim for disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–33, and claim for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

18

## BACKGROUND

19

20

21

22

23

24

Mr. Viernes worked as a carpenter for over 20 years.  AR 133.[1]  On May 5, 2011, at the age of 49, he protectively filed for social security benefits. AR 113–14, 118–27.  Viernes alleged that he became disabled on March 6, 2009.  AR 113, 118.  In his disability application, Viernes claimed he was unable to work because of: (1) ankle fracture requiring surgery, arthritis; (2) status post fractured ankle; (3) arthritis; and (4) gout.  AR 132.  The Social Security Administration (the "Agency") denied his application initially and on reconsideration.  *See* AR 16.

25

26

An administrative law judge ("ALJ") held a hearing on September 20, 2012, where Viernes appeared with counsel.  AR 33–57.  During the hearing, Viernes' counsel asserted that Viernes

27

28

[1]  AR refers to the Administrative Record (ECF No. 11), a certified copy of which was delivered to the undersigned upon the Commissioner's filing of her Answer.

1

met Listing 1.01, 1.02 & 1.03 based on his left ankle.  AR 44-45.  His inability to ambulate made him unable to work.  AR 45.  Viernes also described medical issues such as high blood pressure, heart problems, and high cholesterol.  AR 45–46.  In a decision dated April 5, 2013, the ALJ found that Viernes was not disabled.  AR 16–28.

Mr. Viernes requested review of the ALJ's decision by the Appeals Council, but the ALJ's decision became final when the Appeals Council denied review on August 29, 2014.  AR 1–7.  On September 22, 2014, he filed Complaint (ECF No. 1) in federal court, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The Commissioner filed her Answer (ECF No. 8) on November 24, 2014.  Viernes filed a Motion to Remand (ECF No. 12), and the Commissioner filed a Response and Cross-Motion to Affirm (ECF Nos. 16, 17).  The court has considered the Motion, the Response and Cross-Motion, and Viernes' Reply (ECF No. 18).

## DISCUSSION

### I.   APPLICABLE LAW

#### A.   Judicial Review of Disability Determination

District courts review administrative decisions in social security benefits cases under 42 U.S.C. § 405(g).  *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute provides that after the Commissioner has held a hearing and rendered a final decision, a disability claimant may seek review of that decision by filing a civil lawsuit in a federal district court in the judicial district where the disability claimant lives.  42 U.S.C. § 405(g).  The statute also provides that the district court may enter, "upon the pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  *Id.*

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005).  But the Commissioner's findings may be set aside if they are based on legal error or not supported by substantial evidence.  *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

2

might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, a court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence'." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (quoting *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

Under the substantial evidence test, a court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2003). When the evidence will support more than one rational interpretation, a court must defer to the Commissioner's interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Consequently, the issue before a court is not whether the Commissioner could reasonably have reached a different conclusion, but whether the final decision is supported by substantial evidence.

It is incumbent upon an ALJ to make specific findings so that a court does not speculate as to the basis of the findings when determining if the Commissioner's decision is supported by substantial evidence. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014). Mere cursory findings of fact without explicit statements about what portions of the evidence were accepted or rejected are not sufficient. *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981). An ALJ's findings should be comprehensive, analytical, and include a statement explaining the "factual foundations on which the ultimate factual conclusions are based." *Id. See also Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (an ALJ need not discuss all the evidence in the record, but must explain why significant probative evidence has been rejected).

## B. Disability Evaluation Process

A claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant must provide specific medical evidence to support his or her claim of disability. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998). If a claimant

establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *See Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (noting that a claimant bears the burden of proof until the final step in the evaluation process).

## II. THE ALJ'S DECISION

An ALJ follows a five-step sequential evaluation process in determining whether a claimant is disabled. 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). If at any step an ALJ makes a finding of disability or non-disability, no further evaluation is required. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

Here, the ALJ followed the five-step sequential evaluation process and issued an unfavorable decision on April 5, 2013 (the "Decision"). AR 16–28. Viernes does not challenge the ALJ's findings at steps one through three, but asserts legal error at steps four and five.

### A. Step One

The first step of the disability evaluation requires an ALJ to determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit. 20 C.F.R. §§ 404.1572(a)–(b), 416.972(a)–(b). If the claimant is currently engaging in substantial gainful activity, a finding of not disabled is made. If the claimant is not engaging in substantial gainful activity, the analysis proceeds.

At step one in the Decision, the ALJ found that Mr. Viernes had not engaged in substantial gainful activity since March 6, 2009, the alleged onset date. AR 18. Given his lack of substantial gainful activity, the ALJ's analysis proceeded to the second step.

### B. <u>Step Two</u>

The second step of the disability evaluation addresses whether a claimant has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no

1    more than a minimal effect on the claimant's ability to work.  20 C.F.R. §§ 404.1521, 416.921;

2    Social Security Ruling ("SSR") 85-28, 1985 WL 56856 (Jan. 1, 1985), SSR 96-3p, 61 Fed. Reg.

3    34468 (July 2, 1996); SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996).[2]  If a claimant does not have

4    a severe medically-determinable impairment or combination of impairments, then an ALJ will

5    make a finding that a claimant is not disabled.  If a claimant has a severe medically-determinable

6    impairment or combination of impairments, then an ALJ's analysis proceeds to the third step.

7         At step two in the Decision, the ALJ found that Viernes had the following severe

8    impairment: a history of left ankle distal fibular fracture, status post open reduction, and internal

9    fixation.  AR 18.  Viernes testified during the hearing that he also suffers from high blood pressure,

10   heart problems, and high cholesterol.  AR 45–46.  The Decision found that hypertension, gout,

11   hyperlipidemia, and obesity were non-severe medically determinable impairments, and there was

12   insufficient evidence to find that these conditions were severe impairments.  AR 18–19.  With

13   regard to any impairment of the hands, wrists, or fingers, such as arthritis, the ALJ found that the

14   record contained no objective evidence, such as x-rays or clinical abnormalities not based on

15   effort-dependent testing, to establish an impairment.  *Id*.  Viernes does not challenge these

16   findings.

17   **C.    Step Three**

18        Step three of the disability evaluation requires an ALJ to determine whether a claimant's

19   impairments or combination of impairments meet or medically equal the criteria of an impairment

20   listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is commonly referred to as the

21   "Listings."  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.826.  If

22   a claimant's impairment or combination of impairments meet or equal the criteria of the Listings

23   and meet the duration requirement, 20 C.F.R. §§ 404.1509, 416.909, then an ALJ makes a finding

24   of disability.  20 C.F.R. §§ 404.1520(h), 416.920(h).  If a claimant's impairment or combination

25   of impairments does not meet or equal the criteria of the Listings or meet the duration requirement,

26

27   _____
[2]  SSRs are the Agency's official interpretations of the Act and its regulations.  *See Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1).  SSRs are entitled to

28   some deference as long as they are consistent with the Act and regulations.  *See Bray*, 554 F.3d at 1223.

1    then the analysis proceeds to the next step.

2         At step three in the Decision, the ALJ noted Viernes' contention that the severity of his

3    impairments met Listings 1.01, 1.02, and 1.03 regarding joint deformity/destruction. AR 19 (citing

4    AR 44, 163–64). The ALJ found, however, that the medical record lacked objective medical

5    evidence of chronic and significant neurological deficits. *Id*. No handheld assistive device was

6    medically necessary for ambulation, and the objective medical evidence showed that Viernes was

7    able to ambulate effectively. *Id*. The ALJ could not rely exclusively on the results of effort-

8    dependent testing within Viernes' control based on the finding that he was not entirely credible.

9    *Id*. Additionally, no treating or examining physician provided a persuasive opinion regarding the

10   existence of listing equivalent severity. *Id*. Thus, the ALJ concluded that Viernes did not have an

11   impairment or combination of impairments that meet or medically equal one of the Listings. *Id*.

12   As such, the ALJ's analysis continued to Viernes' residual functional capacity ("RFC").

13        **D.     Step Four – RFC**

14        The fourth step of the disability evaluation requires an ALJ to determine whether a claimant

15   has the RFC to perform his past relevant work ("PRW"). 20 C.F.R. §§ 404.1520(f), 416.920(f).

16   To answer this question, an ALJ must first determine a claimant's RFC. 20 C.F.R. §§ 404.1520(e),

17   416.920(e). RFC is a function-by-function assessment of a claimant's ability to do physical and

18   mental work-related activities on a sustained basis despite limitations from impairments. SSR 96-

19   8p, 61 Fed. Reg. 34474 (July 2, 1996). In making this finding, an ALJ must consider all the

20   relevant evidence such as symptoms and the extent to which they can be reasonably be accepted

21   as consistent with the objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529,

22   416.929; SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996); SSR 96-7p, 61 Fed. Reg. 34483 (July 2,

23   1996). To the extent that statements about the intensity, persistence, or functionally limiting

24   effects of pain or other symptoms are not substantiated by objective medical evidence, an ALJ

25   must make a finding on the credibility of a claimant's statements based on a consideration of the

26   entire case record. An ALJ must also consider opinion evidence in accordance with the

27   requirements of 20 C.F.R. §§ 404.1527 and 416.927 as well as SSR 96-2p, 61 Fed. Reg. 34489

28   (July 2, 1996); SSR 96-5p, 61 Fed. Reg. 34471 (July 2, 1996); and SSR 06-3p, 71 Fed. Reg. 45593

(Aug. 9, 2006).

After considering the entire record, the ALJ concluded that Mr. Viernes had the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c):

> he is able to lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand for four hours total in an eight-hour workday with normal breaks, walk for four hours total in an eight-hour workday with normal breaks, and sit for six hours total in an eight-hour workday with normal breaks.

AR 19–20. In making this finding, the ALJ considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and the other evidence. AR 20. He also considered opinion evidence. *Id.*

### 1.    Medical Evidence

Insofar as Viernes alleged symptoms that would preclude him from performing the work described in his RFC, the ALJ found that his statements were not supported by the objective findings of the medical record, inconsistent with the medical opinion evidence, and not fully credible.

Mr. Viernes' medical records show that he fractured his ankle in December 2003. AR 21 (citing AR 215–16, 226–27). When conservative treatment failed, he had surgery on his ankle on December 29, 2003. *Id.* (citing AR 218, 229). In February 2004, the surgeon removed the screw from Viernes' ankle. *Id.* (citing AR 223–24). On month later, Viernes' range of motion was "excellent," and he was "full weightbearing in the Cam walker boot." AR 225. Viernes returned to his work as a carpenter eight months after the surgery, AR 185. There was no evidence of medical treatment again until the latter part of 2011, over two years after his alleged onset date of March 6, 2009, and after his disability applications were denied initially on July 12, 2011, AR 58–59, and on reconsideration on August 26, 2011, AR 21, 60–61.

On September 12, 2011, Viernes established care with Joseph Yu, M.D., who specializes in sports medicine and orthopedics. AR 22 (citing AR 204). Viernes complained of pain, aching, and swelling in his left ankle. *Id.* Dr. Yu conducted a clinical examination of Viernes and reviewed his x-rays, finding some tenderness and localized swelling. AR 204. Dr. Yu noted: "When he lifts more than 100 pounds he has pain. When he walks or stands for more than 2 hours

he has pain as well.  He has difficulty working in construction as a result of this."  AR 204.  The ALJ found that "Dr. Yu's plan of treatment was quite conservative: 'No immediate treatment needs to be done at this time.  He could need hardware removal in the future.  It is difficult to say whether he truly has hardware pain.  Also, he could have peroneal tendinitis'."  AR 26 (quoting AR 204).

The Decision noted that in February 2012, Viernes sought care from Carmelo V. Rillera, M.D.  AR 200–01.  On a review of systems, Viernes reported ankle pain, especially when doing heavy lifting or extended walking and standing as well as ankle swelling.  AR 22 (citing AR 200).  He had no edema in his extremities.  *Id*.  His neurological examination was normal.  AR 22 (citing AR 201).  With regard to Viernes' left ankle, Dr. Rillera found: "TENDERNESS LATERAL ASPECT OF THE L ANKLE, FROM [full range of motion] STABLE AMBULATORY."  *Id*.  The doctor adjusted Viernes' blood pressure medication and told him to consider going to Access for medical coverage.  AR 22 (citing AR 202).  Dr. Rillera further advised Viernes to consult with an orthopedist, but also wanted to see him in a follow-up appointment three months later.  *Id*.  The record does not show that Viernes returned to Dr. Rillera for follow up care.

Viernes returned to Dr. Yu on March 12, 2012, with worsening left ankle symptoms.  AR 22 (citing AR 203).  Dr. Yu's treatment notes indicate he had mild swelling at the lateral ankle, and x-rays showed some lucencies around the screws.  *Id*.  Viernes told Dr. Yu he had difficulty standing and walking for more than 20 minutes at a time, and he used crutches "intermittently."  AR 203.  Dr. Yu noted that Viernes had possible symptomatic hardware and hardware removal may be considered in the future to help with his pain.  AR 22 (citing AR 203).  The doctor also stated, "I recommend vocational rehab so that he can redirect him [*sic*] to a job that uses his skills.  More likely than not, he will need standing and walking restrictions.  A sit down job may be more suited for him."  AR 203.  The record does not indicate that Viernes returned to Dr. Yu.  AR 22.

The Decision described Dr. Yu's recommendation as "speculation" that was "not supported by the objective medical evidence" and was contradicted by Dr. Yu's conservative treatment plan.  AR 25.  The ALJ therefore gave Dr. Yu's opinion less weight.  *Id*.  However, the ALJ described Dr. Yu's conclusion that Viernes remained able to work as significant.  *Id*.

On May 11, 2012, Viernes established care with Harpreet Panesar, D.O.  AR 22 (citing

AR 205).  On clinical examination, Dr. Panesar noted that peripheral vascular and neurologic examinations were normal, including no edema, normal muscle strength, and a normal gait.  *Id*. The ALJ observed that Dr. Panesar did not perform a musculoskeletal examination on this visit. *Id*.  However, the record indicates that Dr. Panesar reviewed Dr. Yu's treatment notes, and opined:

> Given my examination of Terry, I agree with Dr. Yu that he cannot work on his feet given the extent of his ankle hardware issues and arthritis. But due to his arthritis in his wrists and hands, I do not think he is able to work a desk job or a seated job since he cannot use his hands for more than 10 minutes without having pain and needing to take medication.

AR 206.

When considering the weight of this opinion, the ALJ rejected the doctor's opinion "as a bit premature" given that Viernes' May 2012 appointment with Dr. Panesar was his first.  AR 25. Although the ALJ found that Viernes did not have a medically determinable impairment of the wrists, hands, or fingers, the ALJ noted that Dr. Panesar failed to mention any abnormal clinical findings or abnormal x-ray findings regarding Viernes' wrists, hands, or fingers. AR 25–26. Thus, it was unclear from the progress note whether Dr. Panesar specifically examined Viernes' hands, wrists, fingers, or left ankle in order to form her opinion.  AR 26.  Instead, the ALJ found that the doctor relied heavily on Viernes' subjective complaints, and the ALJ found him not entirely credible. *Id*.

The Decision recognized that Viernes returned to Dr. Panesar on June 25, 2012, complaining of ankle pain bad enough to keep him off his feet for two or three days at a time and that he sometimes needed to use crutches.  AR 22 (citing AR 209).  Clinical examination on this June 2012 visit consisted only of taking Viernes' vital signs and recording his complaints.  AR 22 (citing AR 209). On July 30, 2012, he returned to Dr. Panesar, asking for stronger pain medication due to increased pain and decreased efficacy of his medications.  AR 22 (citing AR 212).  Viernes reported that his limp was occurring all the time and he used crutches a couple of times in the prior month.  AR 212.  The ALJ noted again that clinical examination on this July 2012 visit consisted only of taking Viernes' vital signs and recording his complaints.  AR 22 (citing AR 212).

Dr. Panesar treated Viernes twice in September 2012.  On the September 4, 2012 visit, Viernes reported three episodes of severe foot and ankle pain bad enough to require use of crutches.

AR 22 (citing AR 211).  As with the two previous visits, clinical examination consisted only of taking Viernes' vital signs and recording his complaints.  *Id*.  However, Dr. Panesar noted that Viernes "[d]oes have appt with his lawyer soon and hopefully these notes will help with his disability claim."  AR 23 (citing AR 211).  On September 14, 2012, he followed-up with Dr. Panesar regarding his ankle and arthritis pain.  *Id*.  For the first time, Mr. Viernes came to his appointment on crutches.  *Id*.  The treatment notes do not record the results of a clinical examination beyond taking his vitals; however, Dr. Panesar's notes state that his "feet upon examination where [*sic*] swollen and tender to the touch."  *Id*.

Of note to the ALJ, Dr. Panesar signed an Affidavit on July 13, 2012, after only two clinical visits, attesting to Viernes' treatment and disability.  AR 26 (citing 207–08).  The Affidavit stated that the doctor had been treating him for approximately one year; however, the medical records show that Dr. Panesar treated him for the first time only two months before she signed the Affidavit.  AR 26 (citing AR 207 ¶ 3).  The doctor identified her diagnoses as osteoarthritis of the hand, ankle, and foot, hypertension, gout, and obesity.  *Id*. (citing AR 207 ¶ 4).  Dr. Panesar described limitations in the Affidavit that were mirrored in her treatment notes—Viernes could not sit or stand for more than 20 minutes "without experiencing excruciating pain."  *Id*. (citing AR 207–08 ¶¶ 7–8).  Based on his medical conditions, Dr. Panesar opined that Viernes was "unable to engage in substantial gainful employment."  *Id*. (citing AR 207 ¶ 6).

The ALJ noted that Dr. Panesar's Affidavit mentioned diagnoses that he did not find to be medically determinable, such as osteoarthritis of the hand.  AR 26 (citing AR 207–08).  The doctor also mentioned side effects that were not "supported by the longitudinal record up to that date as being chronic and significant problems … that could not be controlled by adjusting the dosage, changing the time to take the medication, changing medication, prescribing a medication for the side effect, etc."  *Id*.  The ALJ concluded that the Affidavit simply repeated Mr. Viernes' "subjective and exaggerated complaints."  *Id*.  Thus, the ALJ gave "practically no weight to the opinions of Dr. Panesar."  AR 25.  Because Dr. Panesar provided conservative treatment, failed to refer him to specialists, failed to thoroughly examine Viernes beyond taking his vitals on multiple visits, and gave an opinion on an issue reserved for the Commissioner, the ALJ concluded that the

1    doctor appeared to be engaging in patient advocacy.  AR 26.

2              **2.      Consultative Examinations**

3              In addition to Mr. Viernes' medical records, the ALJ considered the opinions of two

4    consultative examiners and two state agency review physicians.  Two months after applying for

5    benefits in May 2011, Viernes was examined by Jerrold M. Sherman, M.D., in July 2011.  *See*

6    AR 185–90 (Orthopedic Examination & Evaluation).  Viernes was 66 inches tall and weighed 250

7    pounds.  AR 21 (citing AR 186).  He gained the examining room table easily, sat up from a lying

8    position without difficulty, and performed an 80% of normal squatting maneuver.  *Id*.  Examination

9    of Viernes' left ankle revealed a well-healed lateral surgical scar, and there was no swelling or

10   palpable click.  *Id*. (citing AR 187).  An examination of the neck, upper extremities, back, and

11   lower extremities with the exception of the left ankle was unremarkable.  *Id*. (citing AR 186).  Dr.

12   Sherman noted that x-rays of Viernes' left ankle revealed a well-healed fracture of the lateral

13   malleolus with a plate and screws in place, and the ankle joint was maintained.  *Id*. (citing AR 187).

14   Viernes told Dr. Sherman that he "occasionally" used a cane; however, he entered the examination

15   room with a normal gait using no cane, brace, or assistive device to ambulate, and he easily walked

16   on his heels and toes.  *Id*. (citing AR 185).  Dr. Sherman opined:

17               Mr. Viernes is able to sit, stand, and walk for six hours during the course of an eight
                -hour day and does not require a cane, brace, or assistive device to ambulate.  He
18               can frequently lift 50 pounds and occasionally lift 100 pounds.  He has no
                restrictions regarding forward bending at the waist, squatting, kneeling, reaching,
19               pushing, pulling, grasping, or fine manipulation activities with the hands.

20   AR 187.  The ALJ gave Dr. Sherman's opinion significant but not controlling weight because more

21   recent medical evidence directed a finding that Viernes was limited to work at the medium level

22   of strength.

23             After the administrative hearing, in late December 2012, Viernes presented to Richard A.

24   Cestkowski, D.O. for an orthopedic examination.  *See* AR 237–52 (Social Security Evaluation).

25   The doctor's report indicates a review of Viernes' surgical records as well as Dr. Yu's treatment

26   records and Dr. Sherman's previous examination.  AR 23 (citing AR 237–38).  Dr. Cestkowski

27   stated that Viernes was cooperative for his examination and there was no evidence to suggest

28   symptom magnification.  *Id*. (citing AR 238).  When tested with the Waddell Inappropriate

Symptoms Questionnaire to gauge the reliability of his subjective reports of pain and limitation, all signs were negative. *Id*. Nevertheless, Viernes reported that his pain level was a 10, meaning the worst pain possible, even though Dr. Cestkowski noted that he was not in acute distress through the evaluation process. *Id*. The doctor's report does not state a finding to support the medical necessity of a handheld assistive device for ambulation; however, Viernes ambulated to the examining room with the use of two crutches. *Id*. (citing AR 239). He was able to ambulate without the crutches, but Dr. Cestkowski said he did so with a slow, hesitant gait favoring his left side. *Id*. Viernes had mild difficulty rising from the examining table to the floor. *Id*. He was not able to heel and/or toe walk, squat, or kneel. *Id*.

Surgical scarring was present over the lateral aspect of Viernes' left ankle, consistent with his prior surgery. *Id*. (citing AR 238). Dr. Cestkowski found mild soft tissue swelling in the left ankle joint and Viernes complained of pain with lateral palpation. *Id*. Mild soft tissue swelling was also present in the right ankle. *Id*. The right ankle joint was also tender to palpation, primarily over the medial aspect, but there was no evidence of right ankle joint crepitation, instability, or varus/valgus deformity. *Id*. The remainder of the orthopedic examination of Viernes' right and left lower extremity was unremarkable. *Id*. The upper extremities were unremarkable, including an examination of his hands. *Id*.; *see also* AR 238 ("He could make a fist with both hands. He had good digital dexterity techniques of both hands as well."). Dr. Cestkowski's examination of Viernes' neck and back was also unremarkable. *Id*. (citing AR 238). A neurological examination of the upper extremities was normal, including normal strength. *Id*. (citing AR 239).

Dr. Cestkowski opined that Viernes remained able to perform essentially medium work. AR 25 (citing AR 244–49). The doctor indicated that he is able to lift and/or carry up to 10 pounds continuously, up to 20 pounds frequently, and up to 50 pounds occasionally. *Id*. (citing AR 244). The doctor further opined that Viernes was able to sit for six hours total in an eight-hour workday, stand for four hours total in an eight-hour workday, and walk for four hours total in an eight-hour workday. *Id*. (citing AR 245). The ALJ concluded that this finding "amount[ed] to eight hours, or the entire workday, on the feet." AR 25.

The ALJ gave substantial weight to Dr. Cestkowski's opinion in limiting Viernes to work

at the medium level of strength.  AR 25.  However, the ALJ did not accept the doctor's opinions

regarding non-exertional limitations, environmental limitations, or functional abnormalities given

the lack of objective medical evidence in the record as well as the lack of objective findings on

examination.  *Id.*  These limitations and functional abnormalities included activities such as

reaching overhead, operating foot controls, performing postural activities, exposure to extreme

cold and unprotected heights, and an inability to walk a block at a reasonable pace on rough or

uneven surfaces.  AR 246–48.  The ALJ found that the functional abnormalities Viernes

demonstrated in Dr. Cestkowski's clinical examination were based on effort-dependent testing

within Viernes' control, and that Viernes was not entirely credible.  AR 25.  The record did not

support Viernes' presentation to Dr. Cestkowski as typical because Viernes had previously

demonstrated abilities for other doctors, including Drs. Sherman, Yu, Rillera, and Panesar.  AR 25.

The ALJ also considered the findings of the state agency medical consultants, Charles Fina,

M.D., and George Nickles, M.D., who concluded that Viernes' physical impairments were not

severe.  AR 195 (Medical Evaluation/Case Analysis), AR 196 (Medical Report of Contact); *see*

*also* AR 191–94, 197–99 (DDS Disability Worksheets).  Similar to Dr. Sherman, the ALJ gave

the opinions of Drs. Fina and Nickles significant but not controlling weight because more recent

medical evidence directed a finding that Viernes was limited to medium work.  AR 24–25.

### 3.    Credibility

The ALJ found that the inconsistencies in Mr. Viernes' statements and the lack of objective

medical evidence undermined his credibility and contradicted the alleged degree of impairment

severity.  AR 20–21.  For example, in a May 2011 Disability Report submitted shortly after his

disability application, Viernes stated that he stopped working on March 6, 2009, because of a "lack

of work."  AR 132.  During the hearing, the ALJ asked Viernes if something happened around that

timeframe that caused him to stop working, to which Viernes responded, "No, my foot was hurting

and so they like laid me off."  AR 40.

In an Affidavit submitted after the hearing in October 2012, Viernes stated that he went

back to work immediately after his second ankle surgery in 2004 to provide for his family.

AR 163.  He stopped working in March 2009 because "the pain became too great" and he "was

forced to no longer work." *Id*. He represented that he did not seek medical treatment between 2009 and 2011 because he did not have health insurance, even though he was "in tremendous pain." *Id*. He could not afford health insurance because he was not employed. *Id*. Viernes stated that his only past relevant work was in construction and that "was hard labor." AR 164.

Based on these statements, the ALJ concluded that Viernes "worked for years at a physically strenuous occupation after his ankle surgeries." AR 20–21. Although the Affidavit represents that the pain became too great and Viernes was forced to no longer work, the ALJ found that was "flatly contradicted by his prior statement that he stopped working not due to his impairments but rather due to lack of work in the construction industry." AR 21. Further, the record contained no medical evidence prior to his work stoppage to show increasing symptoms, which would be expected if Viernes' statements were true. *Id*. The ALJ noted that "[e]ven though he was working in early 2009 and therefore could afford medical treatment, he apparently did not seek any medical treatment despite his statement that his symptoms were getting worse by early 2009." *Id*. Based on a "lack of any medical treatment whatsoever" around March 2009, the ALJ concluded that the evidence supported Viernes' "initial report that he really stopped working due to a downturn in the construction industry in the Las Vegas area." *Id*. If the lack of medical insurance were a serious issue, the ALJ stated that he would anticipate seeing extensive discussions about that between Viernes and his treating sources. AR 24. However, Dr. Rillera told Viernes about coverage through Access, and the record contains no evidence that Viernes sought assistance from Clark County to get medical treatment. *Id*.; *see also* AR 202.

Additionally, the ALJ found that the objective medical evidence and Viernes' treatment history contradicted the alleged degree of impairment severity. AR 21. Although Viernes returned to work as a carpenter eight months after surgery in 2004, the record contained no evidence of medical treatment until the latter part of 2011, after Viernes' disability applications were denied initially and on reconsideration, and years after the alleged onset date in March 2009. *Id*. When Viernes filed his disability applications and met with a claims representative in-person, the representative reported that Viernes "exhibited no limitations whatsoever during the interview." *Id*. (citing AR 129). Before his claims were denied, on July 1, 2011, Dr. Sherman examined

14

Viernes and reported largely unremarkable results. *Id.* (citing AR 186). Thus, Dr. Sherman opined that Viernes remained able to perform the full range of heavy work. AR 24 (citing AR 187–89). After his claims were denied, Viernes' subjective symptoms became much worse. AR 23. The ALJ found that "the crutches appeared as his hearing approached" and at the second consultative examination. *Id.* However, the ALJ found no evidence in the record "that special shoes or an ankle brace was ever discussed with treating sources, and, at the hearing, the claimant denied using any type of support or brace; he simply went straight to crutches." AR 23–24. In addition, Dr. Cestkowski's second exam did not produce findings to support the medical necessity of any handheld assistive device for ambulation. AR 23.

The Decision noted that after the denials, Viernes also attempted to establish care with three new doctors: Yu, Rillera, and Panesar. AR 24–26. However, his treatment with specialists, "such as Dr. Yu, ended relatively quickly," and Dr. Panesar did not refer Viernes "to any specialists, such as an orthopedic surgeon to consider removal of the hardware in the left ankle, a rheumatologist to treat [his] alleged symptoms of gout, etc." AR 24. Additionally, the ALJ noted that Viernes did "not have laboratory work done on a regular basis for gout in order to check his uric acid level." *Id.* His treatment with Dr. Panesar was "relatively routine," and the record indicated that it was "more to obtain medication refills and to bolster his claim for disability rather than for actual treatment" as evidenced by the lack of examinations. *Id.* Dr. Panesar was the only physician who either treated or examined Viernes to opine that he was unable to perform any work. AR 26. However, the doctor's lack of clinical findings, failure to refer Viernes to specialists, conservative course of care, and treatment notes indicating a desire to help Viernes' disability claim all caused the ALJ to conclude that her opinion was patient advocacy. AR 24–26. These contradictions significantly diminished Viernes' credibility for the ALJ. *Id.*

### E. Step Four – Ability to Perform PRW

Once an ALJ has determined a claimant's RFC as an initial consideration at step four, an ALJ utilizes the RFC assessment to determine whether a claimant can perform his PRW. 20 C.F.R. §§ 404.1520(f), 416.920(f). PRW means work a claimant performed within the last 15 years, either as the claimant actually performed it or as it is generally performed in the national economy.

15

20 C.F.R. § 404.1560(b).  In addition, the work must have lasted long enough for a claimant to learn the job and to perform it as SGA.  20 C.F.R. §§ 404.1560(b), 404.1565, 419.960(b), 416.965. If a claimant has the RFC to perform his or her past work, then an ALJ makes a finding that a claimant is not disabled.

At step four in the Decision, the ALJ concluded that Viernes was capable of performing his PRW as a carpenter.  AR 26.  Viernes' PRW as a carpenter is skilled work with a specific vocational profile ("SVP") of 7, and is generally performed at a medium level of strength, but was heavy work as Viernes actually performed it.  *Id*.[3]  After comparing Viernes' RFC with the physical demands of his PRW, the ALJ found that Viernes is able to perform his PRW as it is generally performed.  *Id*.  Despite this finding, the ALJ continued to step five to make alternative findings.

### F.   Step Five

Step five of the disability evaluation requires an ALJ to determine whether a claimant is able to do any other work considering his RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 416.920(g).  If he or she can do other work, then an ALJ makes a finding that a claimant is not disabled.  The Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, are commonly known as the "Grids," and specific sections are referred to as a Medical-Vocational rule.  The Grids aid the ALJ in the analysis at step five for cases that cannot be evaluated on medical considerations alone.  The Grids consist of three tables that each represent a different physical exertional level: sedentary, light, and medium work.  *Id*.  Each table also presents the vocational factors Congress has identified as important: age, education, and work experience.

If a claimant can perform all or substantially all of the exertional demands at a given exertional level, the Grids direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile.  SSR 83-11, 1983 WL 31252 (Jan. 1, 1983).  When a claimant cannot perform substantially all of the exertional demands of work at a given level of

---

[3]  The Dictionary of Occupational Titles (DOT) describes Viernes' PRW as a carpenter at DOT 860.381-022, 1991 WL 681972.

exertion and/or has non-exertional limitations, the Grids are used as a framework for decision-making, unless there is a particular rule that directs a conclusion of "disabled" without considering the additional exertional and/or non-exertional limitations. *See* SSR 83-12, 1983 WL 31253 (Jan. 1, 1983); SSR 83-14, 1983 WL 31254 (Jan. 1, 1983). If the claimant has solely non-exertional limitations, Medical-Vocational Rule 204.00 provides a framework for decision-making. SSR 85-15, 1985 WL 56857 (Jan. 1, 1983).

Although a claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Commissioner. The Commissioner is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do. *Yuckert*, 482 U.S. at 141–42; *see also Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012) (citing 42 U.S.C. § 423(d)(2)(A)).

At step five in the Decision, the ALJ alternatively determined that Viernes could perform jobs that exist in significant numbers in the national economy, considering his age, education, work experience, and RFC, in conjunction with the Grids. AR 27. On the alleged date of disability, he was 49 years old, which categorized him as a younger individual age 18–49, but he subsequently changed age categories to "approaching advanced age." *Id*. Viernes has at least a high school education and is able to communicate in English. *Id*. The transferability of his job skills was not material to the ALJ's determination of disability because using the Grids as a framework supported a finding that Viernes was not disabled. *Id*.

The Decision states that, considering his age, education, and work experience, Medical-Vocational Rules 203.29, 203.30, 203.22, and 203.23 directed a finding of "not disabled" because Viernes had the RFC to perform a full range of *medium* work. *Id*. In the alternative, considering his age, education, and work experience, Medical-Vocational Rules 202.21, 202.22, 202.14, and 202.15 directed a finding of "not disabled" because Viernes had the RFC to perform a full range of *light* work. *Id*. The ALJ found that Viernes' additional limitations have little or no effect on the occupational base of unskilled medium or light work given that he "is physically capable of being on his feet for eight hours out of an eight-hour workday." AR 27–28. Under the framework of the Grids, a finding of "not disabled" was therefore appropriate. *Id*.

1

**III.    THE ADMINISTRATIVE HEARING**

2

In addition to challenging the ALJ's application of the five-step sequential evaluation

3

process, Viernes asserts that the ALJ violated his due process rights during the administrative

4

hearing on September 20, 2012, by unreasonably preventing counsel for Viernes to present her

5

case.  The court has carefully reviewed the hearing transcript.  *See* AR 33–57.

6

Viernes appeared at the hearing with his counsel, Brandy Brown, Esq.  AR 35.  Prior to

7

questioning Viernes regarding his symptoms, the ALJ first discussed the medical exhibits with

8

counsel.  AR 36–38.  The ALJ notes the lack of medical records dating back to Viernes' alleged

9

onset date of March 6, 2009: "The earliest ones in the file of a treatment nature appear to be …

10

[from] Total Sports Med, September 12th, 2011."  AR 37.  The ALJ asked if counsel had been

11

able to find anything earlier, and the following exchange occurred:

12

ATTY: Your Honor, we requested the surgery records.  Because the eight years had passed, they were unable to --

13

ALJ: Say again?

14

ATTY: Sorry, because eight years had passed, they did not keep a copy of the records.  We were unable to obtain the same and we did request them.  They don't have them.

15

ALJ: Okay.  So what did you want to amend the alleged onset date to, then, the earliest records in the file, September 12th, 2011?

16

ATTY: No, I mean, still the 2009 date

17

ALJ: With the medical records, you're out of luck on that alleged onset date.

18

ATTY: He can testify as to when he's experienced pain.

ALJ: That's not medical records.  I need medical records.  So, do you want to try

19

to get something after the hearing?

ATTY: Sure, I can try to subpoena the previous doctor from the surgery, since he

20

doesn't have records.

ALJ: Well, you can get a statement from him.

21

ATTY: Yeah. I didn't --

22

ALJ: Saying, yeah, I remember doing surgery on Mr. Viernes on thus-and-such date for thus-and-such problem, you know, but you're going to need something to

23

get you back earlier than right now, at 9/12/2011 or in the timeframe.  So let me -- okay, so Tressa, we're going to put it in post --

24

HR: Okay.

25

ALJ: -- for Ms. Brown to update with older med records.  Okay.  I'll give you 30 days on that, all right?

26

ATTY: Thank you, Your Honor.

27

AR 37–38.  The ALJ asked Viernes about his ankle surgery and reiterated that counsel would look

28

for the surgical records:

18

ALJ: Okay. All right, well, your attorney is going to try to find some records … that would get us back to that injury in … March of '09, if nothing else, a statement from the doctor … saying, oh, this is what he remembers. Then I would be surprised if they've destroyed records already from '09. They've probably got them on a disk somewhere. …

ATTY: I have an affidavit of the custodian of records, saying there's no records.

ALJ: Oh, that shows you how --

ATTY: I'll try harder.

ALJ: It shows you how much he tried to find them.

ATTY: I'll try harder.

ALJ: Yeah. Yeah. Okay. All right.

AR 41–42.

The ALJ questioned Viernes about why he was unable to work and permitted his attorney to do the same:

ALJ : ... Let me see if Ms. Brown has questions for you.

ATTY : (No verbal response.)

ALJ : And if you don't ask any, don't worry about it because --

ATTY : I'm just making sure I'm not repeating --

ALJ : -- you know --

ATTY: -- the same ones.

ALJ : Yeah. Well, if you do, you'll get yelled at.

ATTY : Okay, good to know .

ALJ : The attorneys that work in front of me all the time know that I ask basically what I want to know and --

ATTY: The only --

ALJ: -- sometimes attorneys who haven't appeared in front of a Judge, Mr. Viernes, think that --

CLMT: Yes.

ALJ: -- you know, they need to really get into it and ask a bunch of crap, you know, and to impress --

CLMT: Yeah. Yes, sir.

ALJ: -- the client --

CLMT: Yeah.

ALJ: and once you see me drop the pen like that, that means I'm not really interested anymore.

CLMT: Uh-huh.

ALJ: Okay?

CLMT: Yeah.

ALJ : So, Ms. Brown, with those guidelines --

ATTY: Holy crap.

ALJ : any questions?

ATTY: I think I'm going to throw up.

ALJ: Any questions?

BY THE ATTORNEY:

19

Q The only question I have is do you think you're capable of using public transportation?
A No. Yes, I think.
ATTY: Okay.
ALJ: Okay.

AR 52–54.  After questioning the vocational expert, the ALJ asked Viernes' counsel if she had any questions for the expert.  AR 56.  Counsel stated that she did not.  *Id*.

At the end of the hearing, the ALJ revisited the prior conversation regarding additional time to supplement the record:

ALJ: Okay. Okay. So, Mr. Viernes, we're going to leave this record open so your attorney can try to find something of a medical nature that gets us back closer to your alleged onset date of March 6, '09.
CLMT: Okay.
ALJ: And I'm going to leave the record open for 30 days for her to try to get those, okay?
CLMT: Yes, sir.
ALJ: If you need more time, Ms. Brown, then you call me up and whine and snivel and I might grant you additional time, okay?
ATTY: It's not my style, Your Honor, but okay.
ALJ: All right. Now, after 30 days, my clerk has to come to me to see if I'll give you additional time, you know, to try to find the records or the statement, whatever that you're looking for.
ATTY: Okay.

AR 56–57.

IV.     **THE PARTIES' POSITIONS ON APPEAL**

A.     **Viernes' Position**

Mr. Viernes seeks reversal and remand of the ALJ's decision on four grounds.  *See* Pl.'s Mot. (ECF No. 12).  First, Viernes argues that the ALJ erred by giving the medical opinion of his treating physician, Dr. Panesar, "practically no weight."  *Id*. at 3–6 (citing AR 25).  The ALJ rejected as premature Dr. Panesar's May 11, 2012 opinion regarding the level of work he was able to perform because this opinion was made on Viernes' first visit.  *Id*. at 5.  However, he argues the opinion was not premature because the doctor had access to his medical records and personally examined him.  *Id*.  Additionally, Viernes asserts that "Dr. Panesar made an inadvertent error when executing the Affidavit dated July 13, 2012," which represented that he had treated with the doctor for approximately one year.  *Id*.  The error had no bearing on Dr. Panesar's evaluation of Viernes' condition.  *Id*.  Mr. Viernes also argues that the ALJ should have given Dr. Panesar's opinion

20

significant weight because it was consistent with the opinions of Dr. Sherman and Dr. Yu, who both noted that Viernes had pain in his ankle, tenderness, swelling, and difficulty walking and standing. *Id.*; *see also* Reply (ECF No. 18) at 3–5.[4]

Second, Viernes asserts that the ALJ unreasonably restricted his ability to present his case and failed to consider any evidence elicited by his counsel. Mot. at 6–7. Viernes waited approximately a year and a half to receive a fair and impartial hearing; however, he did not receive such a hearing because the ALJ threw down his pen, made intimidating comments, and demonstrated actions equivalent to "a two year old having a tantrum." Reply at 7. Although the ALJ gave counsel the opportunity to ask questions about the case, the ALJ's statements caused counsel to feel so hindered that she only asked Viernes one question. Mot. at 7. The ALJ's statements show that he had no intention of considering any of Viernes' statements elicited by his counsel's direct questions. *Id.* Because the ALJ's statements demonstrated a failure to give any weight to Viernes' testimony upon counsel's questions, the Decision "was not based on the evidence presented." *Id.* Additionally, the fact that the ALJ allowed counsel to supplement the record with Viernes' surgical records shows that the ALJ was simply trying to find a reason to deny Mr. Viernes benefits and not being impartial." Reply at 8. The ALJ violated Viernes' due process rights by not affording him a meaningful opportunity to be heard.

Third, Viernes contends that the ALJ failed to fully consider the vocational expert's opinion and, therefore, failed to properly assess Viernes' RFC. *Id.* at 7–8. The ALJ asked the vocational expert, Jack Dymond, whether Viernes had skills that would be transferrable to a sedentary occupation, to which Dymond responded, "No." *Id.* at 8 (citing AR 56). The ALJ disregarded this testimony by finding that Viernes was capable of being on his feet for an eight-hour workday and capable of both medium and light unskilled work. *Id.* Additionally, Viernes argue the finding regarding medium and light unskilled work violated Medical Vocational Rule

---

[4] The Motion asserts that Drs. Sherman, Yu, and Rillera are all agency physicians. Mot. at 3:24–25. The Reply states that both Dr. Yu and Dr. Cestkowski are "Social Security's Doctor[s]." Reply at 4:23–24. However, the Reply later states that three "independent doctors" (Drs. Cestkowski, Yu, and Panesar) have all found that Viernes is disabled. Reply at 7:8–9. The record indicates that Drs. Sherman and Cestkowski were consultative examiners. *See* AR 184–90, 237–52. However, Drs. Yu, Rillera, and Panesar were treating physicians unaffiliated with the agency. *See* AR 200–11.

200.00(g) because Viernes was unable to perform his PRW and lacked transferable skills. *Id*. In his Reply, Viernes claims that his actual heavy exertion level as a carpenter did not fit into the DOT definition and his correct occupation was drywall installer. *Id*. at 2. The strength required for a drywall installer is "very difficult," not medium. *Id*. at 3. Thus, the ALJ erred in finding that Viernes was capable of performing his PRW.

Fourth, Mr. Viernes maintains that the ALJ failed to articulate legitimate reasons to find that he was not credible. Mot. at 9–11. The ALJ found that Viernes provided conflicting reasons for why he stopped working on March 6, 2009, by representing on separate occasions that he stopped due to a "lack of work" and that he stopped because his impairments became severe enough to prevent him from working. *Id*. at 9. Viernes asserts that these two reasons are not mutually exclusive: "The fact that Claimant did not work because there was a severe shortage of work in his industry does not preclude the fact that concurrent with the work shortage, Claimant's impairment became so severe that even if there were work available he would have been unable to perform it." *Id*. He did not seek physical therapy after the surgery because he needed money so intensely that he tried to work through the pain. Reply at 6. Furthermore, the lack of medical evidence from 2009 to 2011 is explained by the fact that Viernes was unable to afford medical treatment during that period due to his unemployment. Mot. at 9. Finally, Viernes' ability to work for several years in a physically strenuous occupation after undergoing the ankle surgery does not undermine his credibility because the constant physical exertion likely caused or exacerbated his impairment. *Id*. at 10. Thus, the ALJ had no reason to disregard medical evidence based on effort dependent testing. *Id*.

### B.    The Commissioner's Position

The Commissioner seeks affirmance of the Decision asserting that the ALJ properly determined that Viernes' is not disabled. Cross-Mot. & Resp. (ECF No. 16, 17). The Commissioner maintains that the ALJ's findings are supported by substantial evidence and free from legal error.

First, the Commissioner asserts that the ALJ provided good reasons for discounting Dr. Panesar's opinion. *Id*. at 6–8. The ALJ correctly pointed out that her opinion was not supported

by the treatment notes. *Id*. at 6–7. An affidavit signed by Dr. Panesar incorrectly stated that she had been Viernes' treating physician for approximately one year. *Id*. (citing AR 207). Although the treatment notes do not show that Dr. Panesar examined Viernes' hands or wrists, she opined that he could not work a desk job. *Id*. at 6 (citing AR 204–06). Beyond recording vital signs and documenting Viernes' subjective complaints, Dr. Panesar only examined him on two out of his five visits. *Id*. On one exam, she noted his normal strength and gait and found no abnormalities with respect to his feet, legs, or spine. *Id*. at 6–7 (citing AR 205–06). The ALJ reasonably found that Dr. Panesar's opinion was not supported by objective evidence because Viernes' subjective complaints, which were documented as "Patient words" in the treatment notes, served as the basis of her opinion. *Id*. at 7. The opinions of the consultative examiners, who conducted in-person examinations, constituted substantial evidence to support the Decision. *Id*. at 7–8.

Second, Mr. Viernes received due process from the ALJ and his statements did not demonstrate bias against him. *Id*. at 8–11. The Commissioner contends that the Motion takes the ALJ's statements out of context and the record, as a whole, does not show that the ALJ was biased or prevented Viernes' counsel from asking questions or entering evidence into the record. *Id*. at 9–10. Assuming for the sake of argument that the ALJ's comments were improper, they were at most "an expression of impatience for irrelevant questions." *Id*. at 9. The ALJ fulfilled his duty to develop the record because he: (1) encouraged Viernes' counsel to try again to obtain either medical records or a statement from a doctor regarding his ankle surgery, (2) left the record open for 30 days so that counsel could supplement the record, (3) ordered a post-hearing orthopedic evaluation in order to supplement the record with additional medical evidence, and (4) accepted a post-hearing affidavit and letter from Viernes providing additional testimony. *Id*. at 10. The Commissioner states that Viernes' counsel "appears to have had a bad day during the hearing, and was possibly ill." *Id*. at 11 (citing AR 52–53).[5] Thus, even if the court accepts the assertion that the ALJ's statements prevented counsel from asking questions during the hearing, Viernes cannot show that he suffered harm. *Id*. at 10–11.

---

[5] The Commissioner appears to refer to counsel's comment, "I think I'm going to throw up," to suggest she was possibly ill. AR 53.

Third, the Commissioner argues that the Mr. Dymond's testimony regarding the transferability of Viernes' skills was not error because the ALJ properly found that he had the RFC to perform his PRW as it is generally performed.  Additionally, Viernes' transferability of skills was not relevant to the ALJ's alternative finding that he was capable of performing unskilled medium and light work.  According to Agency rules, transferability of skills is an issue only when an individual's severe impairment does not meet or equal the Listing criteria but does prevent the performance of PRW.  *Id*. at 11–12 (citing SSR 82-41, 1982 WL 31389).  Because Viernes could perform his PRW, and the ALJ's alternative finding relied on the Medical-Vocational rules to determine that he could perform unskilled work, Viernes' transferability of skills was inapplicable and Mr. Dymond's testimony regarding the same was irrelevant.  *Id*.

Finally, the Commissioner argues that the ALJ properly assessed Viernes' credibility because the Decision provides clear and convincing reasons for finding his testimony not fully credible.  *Id*. at 12–15.  For example, the ALJ noted that Viernes' failure to seek treatment for his impairments undermines his credibility.  *Id*. at 13 (citing AR 24).  Viernes claims that after his 2003 and 2004 ankle surgery, his ankle pain increased over time to the point where it rendered him disabled on March 6, 2009.  *Id*.  However, Viernes sought no medical care for his ankle from 2004 until his exam with Dr. Sherman in July 2011, despite working as a carpenter and purportedly exacerbating his pain.  *Id*. at 14.  Thus, even if Viernes could not afford to seek medical care after he became disabled, that still does not explain why he failed to seek any treatment in the five years after his surgery until he allegedly became disabled.  *Id*.  Additionally, his lack of employment or health insurance after March 2009 cannot explain why Viernes failed to follow up with a recommendation that he seek public assistance for his medical care.  *Id*. (citing AR 202).  The limited medical evidence and treatment records do not support any limitations beyond what the ALJ found in the RFC.  *Id*.  Furthermore, the Commissioner asserts that Viernes stopped working due to economic concerns rather than his medical impairments.  *Id*. at 15.  When asked the reason he stopped working, Viernes stated that he stopped because of a "lack of work."  *Id*. (citing AR 132).  Only later did Viernes claim that he stopped working because of his impairments.  *Id*. (citing AR 40–41, 163).  Accordingly, substantial evidence supports the ALJ's adverse credibility

24

1    finding. *Id*.

2    <u>**ANALYSIS AND FINDINGS**</u>

3       Reviewing the record as a whole, weighing both the evidence that supports and the

4    evidence that detracts from the ALJ's conclusion, the court finds the ALJ's decision is supported

5    by substantial evidence, and the ALJ did not commit legal error.

6    **I.    THE ALJ PROVIDED SPECIFIC, LEGITIMATE REASONS SUPPORTED BY THE RECORD FOR**

7       **DISCOUNTING DR. PANESAR'S OPINION**

8       Agency regulations distinguish among the opinions of three types of physicians: (1)

9    treating physicians (*i.e.*, physicians who actually treat a claimant); (2) examining physicians (*i.e.*,

10    physicians who examine but do not treat a claimant); and (3) non-examining or reviewing

11    physicians (*i.e.*, physicians who neither examine nor treat the claimant, but review the claimant's

12    file). *Lester v. Chater*, 81 F.3d, 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527(d). Generally, a

13    treating physician's opinion is entitled to more weight than an examining physician's, and an

14    examining physician's opinion is entitled to more weight than a reviewing physician's. *Id*.

15    Agency regulations also give more weight to opinions of specialists concerning matters relating to

16    their specialty over that of non-specialists. 20 C.F.R. § 404.1527(d)(5).

17       The ALJ must consider all medical evidence. *See* 20 C.F.R. § 404.1527(b). However,

18    Agency regulations give more weight to opinions that are explained than those that are not. 20

19    C.F.R. § 404 .1527(d)(3). An ALJ need not accept the opinion of any physician, including a

20    treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical

21    findings. *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012). Factors that an ALJ may consider

22    when evaluating any medical opinion include "the amount of relevant evidence that supports the

23    opinion and the quality of the explanation provided; the consistency of the medical opinion with

24    the record as a whole; [and] the specialty of the physician providing the opinion." *Orn v. Astrue*,

25    495 F.3d 625, 631 (9th Cir. 2007).

26       An ALJ is not bound by a treating physician's medical opinion on the ultimate question of

27    disability. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing *Lester*, 81 F.3d at

28    830–31). An ALJ is not required to give controlling weight to a treating physician's opinion unless

25

1    it is well-supported and consistent with other substantial evidence in the record.  *See Chaudhry*,

2    688 F.3d at 671; *see also* 20 C.F.R. §§ 404.927(d)(2), 416.927(d)(2).  When an ALJ rejects the

3    opinion of the treating physician in favor of the conflicting opinion of an examining physician, the

4    ALJ must make "findings setting forth specific, legitimate reasons for doing so that are based on

5    substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *see*

6    *also Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009).  "The ALJ can

7    meet this burden by setting out a detailed and thorough summary of the facts and conflicting

8    clinical evidence, stating [his] interpretation thereof, and making findings." *Tommasetti*, 533 F.3d

9    at 1041 (citation omitted).

10       Here, Mr. Viernes asserts the ALJ improperly rejected the opinion of Dr. Panesar that he

11   was disabled and unable to perform work of any kind.  For the following reasons, the court finds

12   the ALJ provided clear and convincing reasons for rejecting Dr. Panesar's opinion and those

13   reasons were supported by substantial evidence in the record.  In addition, the ALJ provided a

14   detailed and thorough summary of the medical evidence, providing his interpretation and making

15   detailed findings.

16       First, the ALJ properly concluded that a treating physician's opinion on the ultimate issue

17   of disability is not binding on the Commissioner.  *See* SSR 96-5p; 20 C.F.R. § 404.1527(e)(1).

18   Second, the ALJ acknowledged that Dr. Panesar was a treating source but found that her opinion

19   was not supported by the record as a whole.  AR 24–26.  Although Viernes treated with Dr. Panesar

20   on five occasions, the treatment notes consisted mostly of noting Viernes' subjective complaints

21   and only one instance of a full clinical examination.  AR 22–24 (citing AR 205–14); *but see* AR 23

22   (citing AR 213 (noting that Viernes' feet were "swollen and tender to the touch" upon exam)).  On

23   the four other visits, the treatment notes indicate that the doctor did little more than taking Viernes'

24   vital signs, despite his extreme complaints.  AR 22–23.  Additionally, Dr. Panesar signed an

25   inaccurate Affidavit stating she had treated Viernes for a year and opining Viernes' was disabled

26   when in fact she had only seen him for two months and seen him two times.  AR 26 (citing

27   AR 207–08).  Third, the ALJ rejected Dr. Panesar's opinion because it was inconsistent with Dr.

28   Yu's treatment notes that indicating that Viernes remained able to work.  AR 25 (citing AR 203).

26

1    Given that Dr. Panesar provided conservative treatment, failed to refer him to specialists, failed to

2    thoroughly examine Viernes beyond taking his vitals on multiple visits, and gave an opinion on an

3    issue reserved for the Commissioner in an inaccurate affidavit, the ALJ reasonably concluded that

4    the doctor appeared to be engaging in patient advocacy.   *See* AR 22–26.  Her opinion was

5    conclusory and not supported by the clinical record, and the ALJ's finding was not legal error.

6         To the extent there were conflicting opinions and testimony regarding the degree of

7    Viernes' functional limitations, it was the ALJ's duty to resolve those conflicts.  For highly fact-

8    intensive individualized determinations like a claimant's entitlement to disability benefits,

9    Congress has deferred to agency expertise and, for the sake of uniformity, has minimized the

10   opportunity for reviewing courts to substitute their discretion for that of the agency.  *Treichler v.*

11   *Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).  Consequently, it is the ALJ's

12   duty "to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the

13   record."  *Id*. (citing 42 U.S.C. § 405(g) (directing that the Commissioner's findings shall be

14   conclusive as to any fact supported by substantial evidence); *Andrews v. Shalala*, 53 F.3d 1035,

15   1039 (9th Cir. 1995)).

16        Here, the ALJ's findings regarding Viernes' non-severe impairments are supported by the

17   opinions of Dr. Yu, a treating specialist, Drs. Sherman and Cestkowski, the consultative examiners,

18   and Drs. Fina and Nickles, the state agency medical consultants.  AR 21–25.  Dr. Yu opined that

19   vocational rehab and a sit down job may be appropriate.  AR 25 (citing AR 203).  Although the

20   ALJ took issue with parts of Dr. Yu's opinion, he did find it significant that Dr. Yu concluded that

21   Viernes remained able to work.  AR 25.  Dr. Sherman opined that Viernes was capable of

22   performing a full range of heavy work.  AR 24 (citing AR 185–90).  Dr. Cestkowski opined that

23   was capable of working at the medium level of strength.  AR 25 (citing AR 237–52).  Both Drs.

24   Fina and Nickles reviewed the medical records and determined that Viernes' impairments were

25   non-severe.  AR 24–25 (citing AR 195–96).  It was the ALJ's job to consider these doctor's

26   statements about Viernes' abilities and resolve any conflicts it presented with Dr. Panesar's

27   opinion or findings.  If the record will support more than one rational interpretation, the Court

28   must uphold the Commissioner's interpretation. *See Burch*, 400 F.3d at 679.  The ALJ's findings

are amply supported by the record and inferences reasonably drawn from the record. The court finds the ALJ provided specific and legitimate reasons for rejecting Dr. Panesar's opinion, and the Decision is supported by substantial evidence. *See Batson*, 359 F.3d at 1193.

## II.  THE ALJ DID NOT VIOLATE VIERNES' DUE PROCESS RIGHTS

An ALJ may violate a claimant's due process rights by making a decision without considering a full record or failing to articulate his grounds for rejecting a disability claim. *See Dexter v. Colvin*, 731 F.3d 977, 981 (9th Cir. 2013). "ALJs and other similar quasi-judicial administrative officers are presumed to be unbiased." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citation omitted). However, this presumption "can be rebutted by a showing of conflict of interest or some other specific reason for disqualification." *Id.* at 857–58. The Ninth Circuit has held that expressions of sarcasm, impatience, dissatisfaction, annoyance, and even anger do not establish bias as long as they are within the bounds of what imperfect men and women sometimes display. *Id.* at 857 (quoting *Liteky v. United States*, 510 U.S. 540, 555–56 (1994)). Applying the Supreme Court's standard from *Liteky*, the Ninth Circuit has "rejected allegations that due process was violated when isolated parts of an ALJ's conduct were challenged but the record as a whole showed fundamental fairness for the litigants." *Bayliss v. Barnhart*, 427 F.3d 1211, 1215–16 (9th Cir. 2005) (collecting cases). To succeed on a claim that an ALJ violated due process rights by failing to impartially assess evidence, a claimant must show that "the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render fair judgment." *Id.* at 1214–15 (quoting *Rollins*, 261 F.3d at 858).

Mr. Viernes has not made a colorable due process claim here. He alleges that he did not receive a fair and impartial hearing because the ALJ threw down his pen, made intimidating comments, and behaved as a toddler throwing a tantrum. The record reflects that the ALJ made statements during the hearing that could have been perceived as sarcastic, impatient, and the product of frustration. However, the record also shows that: (1) the hearing lasted 24 minutes, (2) Viernes testified in response to the ALJ's questions regarding multiple issues in his case, (3) Viernes' counsel was given an opportunity to ask questions of both Viernes and the vocational expert, (4) the ALJ afforded Viernes an additional 30 days to supplement the record, (5) the ALJ

1    requested a post-hearing consultative examination of Viernes, and (6) the ALJ accepted and

2    considered Viernes' post-hearing Affidavits and supplemental surgical records.

3        The ALJ asked most of the questions at the hearing.  After he finished asking Viernes

4    questions he asked counsel if she had any questions. AR 52–54.  There was no audible response,

5    consistent with a lawyer reviewing her notes. AR 52.  The ALJ then told counsel not to worry if

6    she had no questions.  *Id*.  Counsel's response was that she "was just making sure that [she was]

7    not repeating… the same ones."  *Id*.  The ALJ's response was that she would get "yelled at" if she

8    did.  *Id*.  Counsel responded "Okay, good to know."  *Id*.  The ALJ then appears to have talked

9    directly to Viernes about lawyers who appear in front of him all the time and "ask a bunch of

10   crap… to impress…the client." AR 52–53.  Viernes responds to the ALJ's comments "yeah, …

11   u-huh, … yeah." AR 53.  The ALJ then addressed counsel stating "with those guidelines … any

12   questions?" *Id*.  Counsel responded "holy crap… I think I'm going to throw up."  *Id*.  From the

13   transcript it is not at all clear whether these responses were because counsel felt intimidated or ill.

14   Counsel then stated she only had one question—about whether Viernes could use public

15   transportation.  *Id*.  When Viernes responded he could not, the ALJ acknowledged he "kind of

16   missed the question" and asked some follow up questions. AR 54.  After the ALJ's follow up

17   questions counsel responded "That's it Your Honor."  *Id*.  Counsel was also given an opportunity

18   to question the vocational expert but stated she had no questions. AR 56.  The hearing concluded

19   with the ALJ addressing Viernes telling him the record would be left open for 30 days to allow his

20   counsel "to find something of a medical nature that gets us back closer to your alleged onset date

21   of March 6, '09."  *Id*.

22       The ALJ's comments about lawyers asking "a bunch of crap" to impress clients and

23   comment to Viernes's counsel that if she needed more than 30 days and "whine[d] and snivel[ed]

24   he might give her more time, were unseemly.  However, the record as a whole demonstrates that

25   the ALJ complied with his independent duty to fully and fairly develop the record.  *See Tonapetyan*

26   *v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th

27   Cir. 2001).  Judges are imperfect men and women who have bad days.  The record as a whole,

28   does not establish the ALJ was biased against Viernes or violated his due process rights to be

1    heard.  The court therefore finds that the ALJ's behavior was not so extreme as to display a clear

2    inability to render fair judgment.

3    **III.    THE ALJ DID NOT ERR IN DETERMINING THAT VIERNES COULD PERFORM HIS PRW**

4              Reviewing the record as a whole, the court finds that the ALJ did not err in his assessment

5    that Mr. Viernes has the RFC to perform his PRW as a carpenter at a medium level, or alternatively,

6    to perform light work.  AR 26–28.

7              The ALJ's extensive discussion of the medical evidence read in conjunction with his

8    findings at step two makes it clear that he considered the entire record in determining Viernes'

9    RFC and the physical demands of his PRW as it was generally performed.  *See* 20 C.F.R.

10   §§ 404.1520(f), 416.920(f); *Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010).  The carpenter

11   occupation is skilled work generally performed at a medium level of strength or exertion.

12   Although Viernes testified that he performed his work at a heavy exertion level, the ALJ was not

13   required to use the heavy designation rather than medium in accordance with the DOT definition.

14   PRW is defined as work a claimant performed within the last 15 years "either as the claimant

15   actually performed it *or as it is generally performed in the national economy*."   20 C.F.R.

16   § 404.1560(b)(2)(emphasis added).  The ALJ determined that Viernes' additional limitations had

17   little or no effect on the occupational base of unskilled medium or light work given that he "is

18   physically capable of being on his feet for eight hours out of an eight-hour workday."  AR 27–28.

19   The record supports this finding.  The ALJ determined Viernes had the RFC to perform a full range

20   of medium work, and found that he could perform his carpenter work as it is customarily performed

21   in the national economy, not as he actually performed it in his last job.  AR 26.  There was no error

22   in this finding.

23             Mr. Viernes next argues that the ALJ failed to properly assess his RFC because he did not

24   fully consider the opinion of Jack Dymond, the vocational expert.  Mr. Dymond testified that

25   Viernes did not have skills that would be transferrable to a sedentary occupation.  AR 56.  This

26   argument fails because the transferability of skills was not outcome determinative.  SSR 82–41

27   states, in relevant part:

28             Transferability of skills is an issue only when an individual's impairment(s), though

30

1
2

> severe, *does not meet or equal the criteria in the Listing*[*s*] *… but does prevent the performance of past relevant work* (PRW), and that work has been determined to be skilled or semiskilled.

3 SSR 82-41, 1982 WL 31389 (Jan. 1, 1982).  Dymond's testimony that Viernes did not have skills

4 that would be transferrable to a sedentary occupation is irrelevant because the ALJ found that

5 Viernes was capable of performing his PRW as a carpenter, as the position is customarily

6 performed in the national economy.

7      In addition, the ALJ's finding regarding Viernes' ability to perform medium and light

8 unskilled work did not disregard Medical-Vocational Rule 200.00(g).  At step five, the ALJ

9 alternatively determined, in conjunction with the Grids, that Viernes could perform jobs that exist

10 in significant numbers in the national economy, considering his age, education, work experience,

11 and RFC.  AR 27.  By the time the Decision was issued, Viernes was categorized as an individual

12 "closely approaching advanced age."  *Id*. (citing 20 C.F.R. §§ 404.1563, 416.963).  Grid Rule

13 200.00(g) states, in relevant part:

14
15
16

> Individuals approaching advanced age (age 50–54) may be significantly limited in vocational adaptability if they are restricted to sedentary work.  When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains.

17 Viernes argues that this rule directs a finding of disabled because was unable to perform his PRW

18 and lacked transferable skills.  However, (1) Viernes' RFC did not restrict him to sedentary work,

19 (2) there was no legal error in the ALJ's finding that Viernes could perform his PRW as actually

20 performed in the national economy, and (3) the transferability of skills was not in issue.  Thus,

21 Medical-Vocational Rule 200.00(g) was inapplicable, and the ALJ did not disregard the rule.

22      Lastly, the court rejects Viernes' contention that the correct definition of his occupation

23 was a drywall installer, rather than a carpenter.  In his Reply, Viernes asserts, for the first time,

24 that the ALJ erred in the PRW finding because Viernes' carpenter work was actually performed at

25 a heavy exertional level, which did not fit into the DOT definition.[6]  He argues that the correct

26 occupational definition was drywall installer, which the DOT defines as very heavy work.  *See*

27
28

---

[6] Viernes did not make this argument to the Appeals Counsel, *see* Representative Brief AR 169–83, and he raised it for the first time here in his Reply (ECF No. 18) at 2–3.

1    DOT 842.361-030, 1991 WL 681856.  He cites the description he gave the Agency of his job,

2    "union carpenter metal stud framer, dry wall hanger," and the narrative he provided regarding the

3    lifting and carrying he performed.  Reply (ECF No. 18) at 2 (citing AR 134).  However, this

4    argument fails because he told the Agency that his job title was "carpenter," AR 133, and

5    confirmed to the ALJ under oath that his job history and documentation was accurate.  AR 40.

6         For these reasons, the court finds that the ALJ's conclusion regarding Viernes' PRW is

7    supported by substantial evidence.

8    **IV.    THE ALJ PROPERLY EVALUATED VIERNES' CREDIBILITY**

9         In assessing the credibility of a claimant's testimony regarding subjective pain or the

10   intensity of symptoms, the ALJ engages in a two-step analysis.  *Molina v. Astrue*, 674 F.3d 1104,

11   1112 (9th Cir. 2012) (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)).  In the first

12   step, the ALJ must determine whether the claimant has presented objective medical evidence of

13   an underlying impairment that could reasonably be expected to produce the pain or other

14   symptoms alleged.  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Lingenfelter

15   v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007)).  In this first step, a claimant need only show

16   that his or her impairment could reasonably have caused *some degree* of the symptom alleged.

17   *Garrison*, 759 F.3d at 1014 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)).  A

18   claimant is not required to (i) show that the impairment could reasonably be expected to cause the

19   severity of the symptom, or (ii) produce objective medical evidence of the pain or fatigue, or the

20   severity thereof.  *Id*.

21        If a claimant satisfies the first step of this analysis, and there is no evidence of malingering,

22   the ALJ may only reject the claimant's testimony about the severity of his or her symptoms "by

23   offering specific, clear and convincing reasons for doing so."  *Brown-Hunter v. Colvin*, 806 F.3d

24   487, 493 (9th Cir. 2015) (quoting *Lingenfelter*, 504 F.3d at 1036).[7]  As the Ninth Circuit has

25   ────────────────────

26   [7]  The Commissioner argues that the "clear and convincing" standard does not apply to the ALJ's credibility
     determination because it is contrary to 42 U.S.C. § 405(g) and does not give proper deference to the standard
27   set forth in SSA regulations.  *See* Cross-Mot. & Resp. (ECF Nos. 16, 17) at 13 (discussing *Garrison*, 759
     F.3d at 1015 n.18; *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014)).  However, the Ninth Circuit has
28   specifically and repeatedly rejected this position.  *Brown-Hunter v. Colvin*, 806 F.3d 487, 492–93 (9th Cir.
     2015) (noting that the Commissioner disputed the "clear and convincing" standard and finding that *Burrell*

1    recognized, this is not an easy requirement to meet because the "clear and convincing standard is

2    the most demanding required in Social Security cases."  *Garrison*, 759 F.3d at 1015 (quoting

3    *Moore v. Comm'r Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  However, "the ALJ is not

4    required to believe every allegation of disabling pain," otherwise disability benefits "would be

5    available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  *Molina*, 674 F.3d

6    at 1112 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

7         In evaluating a claimant's testimony, the ALJ may use "ordinary techniques of credibility

8    evaluation."  *Molina*, 674 F.3d at 1112 (quoting *Turner v. Comm'r Soc. Sec.*, 613 F.3d 1217, 1224

9    n.3 (9th Cir. 2010)).  For example, an ALJ may consider factors such as: (i) inconsistencies either

10   in the claimant's testimony or between the testimony and the claimant's conduct; (ii) unexplained

11   or inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

12   (iii) whether the claimant engages in daily activities inconsistent with the alleged symptoms;

13   (iv) the observations of treating and examining physicians and other third parties regarding the

14   claimant's symptoms; (v) functional restrictions caused by the symptoms; and (vi) the claimant's

15   daily activities.  *Molina*, 674 F.3d at 1112; *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996,

16   1006 (9th Cir. 2015) (quoting *Smolen*, 80 F.3d at 1284).

17        "A finding that a claimant's testimony is not credible 'must be sufficiently specific to allow

18   a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible

19   grounds and did not arbitrarily discredit a claimant's testimony regarding pain'."  *Brown-Hunter*,

20   806 F.3d at 493 (quoting *Bunnell*, 947 F.2d at 345–46).  "General findings are insufficient; rather,

21   the ALJ must identify what testimony is not credible and what evidence undermines the claimant's

22   complaints."  *Brown-Hunter*, 806 F.3d at 493 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th

23   Cir. 1998)).  "Although the ALJ's analysis need not be extensive, the ALJ must provide some

24   reasoning" that will allow a reviewing court "to meaningfully determine whether the ALJ's

25   conclusions were supported by substantial evidence."  *Brown-Hunter*, 806 F.3d at 495 (quoting

26   *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014)).

27        In this case, the ALJ's credibility findings are supported by substantial evidence because

28   foreclosed the Commissioner's argument).

the Decision articulates specific reasons for determining that Mr. Viernes' testimony was not entirely credible.   The Decision specifically points out inconsistencies in his testimony and statements to the Agency, as well as the lack of objective medical evidence.

With regard to a lack of objective medical evidence, the ALJ found that Viernes' treatment history contradicted the alleged degree of impairment severity.   AR 21.   Mr. Viernes returned to work as a carpenter eight months after ankle surgery in 2004, but the record contained no evidence of medical treatment until the latter part of 2011, which was after Viernes' disability applications were denied initially and on reconsideration and years after the alleged disability onset date.   *Id*. Before his claims were denied, Dr. Sherman examined Viernes and opined that he remained able to perform the full range of heavy work.   AR 24 (citing AR 186–89).   After his claims were denied, Viernes' subjective complaints became much worse.   AR 23.   The ALJ found no evidence in the record to show any of his treating doctors recommended special shoes or an ankle brace.   AR 23– 24.   The ALJ correctly noted that Viernes went directly to crutches.   Nothing in the medical records of his treating physicians indicate crutches were ever prescribed.   Additionally, Dr. Cestkowski's post-hearing exam did not produce findings to support the medical necessity of any handheld assistive device for ambulation.   AR 23.

Furthermore, the ALJ found that Viernes made untimely and apathetic attempts to seek care with treating doctors.   AR 24–26.   His treatment with orthopedic specialist Dr. Yu "ended relatively quickly."   AR 24.   Viernes only treated with Dr. Rillera one time and he did not follow- up with the doctor's suggestion to seek medical coverage through Clark County's Access program. *Id*.; *see also* AR 202.   These findings are supported by the record. If Viernes' lack of medical insurance was a serious issue as he claimed, the ALJ concluded that the record would show discussions between Viernes and his treating sources about health insurance.   AR 24.   In particular, the ALJ noted that Dr. Panesar was the only doctor to opine that Viernes was unable to work. AR 26.   However, Dr. Panesar's treatment was "relatively routine" and she did not refer Viernes to any specialists despite the severity of his complaints.   *Id*.   These findings demonstrate that the ALJ did not reject Viernes' testimony based solely on a lack of medical evidence corroborating his subjective complaints.   Rather, the ALJ made an adverse credibility finding concerning

Viernes' testimony based on the lack of clinical findings and laboratory testing, a complete absence of any medical records between 2004 and 2011, his treating physician's failure to refer Viernes to specialists, and conservative course of care.  AR 22–26.

The Decision also detailed inconsistencies in Viernes' testimony and statements, which the ALJ found to undermine his credibility.  For example, the ALJ noted that Viernes' May 2011 Disability Report stated that he stopped working on March 6, 2009, because of a "lack of work." AR 132.  During the hearing, the ALJ asked Viernes if something happened around that timeframe to cause him to stop working, to which Viernes responded, "No, my foot was hurting and so they like laid me off."  AR 40.  Viernes' post-hearing Affidavit stated that he went back to work after his ankle surgery to provide for his family, but stopped working in March 2009 because "the pain became too great" and he "was forced to no longer work."  AR 163.  He said he did not seek medical care between 2009 and 2011 because he did not have health insurance, even though he was "in tremendous pain."  *Id.*  He could not afford health insurance while unemployed.  *Id.*

The ALJ found that Viernes worked for years after his ankle surgeries in a physically strenuous job.  AR 20–21.  His assertion that his ankle pain forced him to stop work was "flatly contradicted by his prior statement that he stopped working not due to his impairments but rather due to lack of work in the construction industry."  AR 21.  If his statements were true, the ALJ concluded that the record would contain medical evidence to show increasing symptoms prior to his work stoppage, when he still had medical insurance.  *Id*.  Because the record lacked any treatment from 2004 to 2009, the ALJ found that the record supported "Viernes' initial report that he really stopped working due to a downturn in the construction industry in the Las Vegas area." *Id*.

Despite Viernes' diminished credibility, the ALJ did not completely adopt the RFC assessments of any consultative examiner or state agency consultant.  Instead, he adopted an RFC that was supported by the entire case record.  This is shown in the ALJ's finding that Viernes was only capable of medium work, even though Dr. Sherman opined that he would be capable of performing a full range of heavy work.  The ALJ permissibly found that Viernes' testimony regarding the severity of his symptoms was not supported by the clinical or diagnostic medical

evidence.  AR 36–37.  *See Carmickle v. Comm'r, Social Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); *Rounds*, 807 F.3d at 1006 (finding that the ALJ did not err by discounting the claimant's testimony about the severity of her symptoms because her medical records and daily activities showed a higher level of functionality); *Molina*, 674 F.3d at 1112–14 (affirming ALJ's decision to discount claimant's testimony based on inconsistencies with her daily activities and the medical evidence).  Viewed as a whole, the ALJ's adverse credibility finding was based on the permissible grounds that Viernes' testimony was inconsistent with his own prior statements and the medical evidence, which contradicted the alleged degree of impairment severity.  Because the ALJ's adverse credibility determination was supported by specific, clear, and convincing reasons, the court must uphold it.

## CONCLUSION

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a whole.  It is the ALJ's responsibility to make findings of fact, draw reasonable inferences from the record as a whole, and resolve conflicts in the evidence and differences of opinion.  Having reviewed the Administrative Record as a whole, and weighing the evidence that supports and detracts from the Commissioner's conclusion, the Court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).

Accordingly,

**IT IS RECOMMENDED:**

1.  Viernes Terence R. Viernes' Motion to Remand (ECF No. 12) be DENIED.

2.  The Commissioner's Cross-Motion to Affirm (ECF No. 16) be GRANTED.

3.  The Clerk of Court be instructed to enter judgment accordingly and close this case.

Dated this 30th day of November, 2016.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE